LAW OFFICES OF GERARD FOX, INC.
GERARD P. FOX (SBN 151649)
gfox@foxtriallawyers.com
MORGAN E. PIETZ (SBN 260629)
mpietz@foxtriallawyers.com
BELINDA M. VEGA (SBN 279318)
bvega@foxtriallawyers.com
LAUREN M. GREENE (SBN 271397)
lgreene@foxtriallawyers.com
LAW OFFICES OF GERARD FOX, INC.
1880 Century Park East, Suite 1004
Los Angeles, CA 90067
Tel: (310) 441-0500
Fax: (310) 441-4447

Attorneys for Plaintiff
SKETCHY STUDIOS, LLC

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SKETCHY STUDIOS, LLC**, a Delaware Limited Liability Company, | Case No. |
| Plaintiff; | **COMPLAINT FOR:** <br> **1. FRAUDULENT INDUCEMENT** <br> **2. FRAUDULENT CONCEALMENT** <br> **3. FALSE PROMISE** |
| v. | **4. DECLARATORY JUDGMENT** <br> **5. DECLARATORY JUDGMENT** <br> **6. DECLARATORY JUDGMENT** <br> **7. DECLARATORY JUDGMENT** |
| **FRAME RATES INC.**, a Canadian Corporation, and DOES 1-5, inclusive, | **8. DECLARATORY JUDGMENT** <br> **9. BREACH OF FIDUCIARY DUTY** <br> **10. BREACH OF WRITTEN CONTRACT** <br> **11. BREACH OF IMPLIED CONTRACT** |
| Defendants. | **12. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Sketchy Studios, LLC ("Sketchy Studios" or "Plaintiff") hereby complains and alleges as follows:

## THE PARTIES

1.      Plaintiff Sketchy Studios, LLC, is, and at all times relevant to this Complaint was, a limited liability company registered in Delaware and doing business in California and other places.

2.      Defendant Frame Rates Inc. ("Frame") is a Canadian corporation, its principal place of business is New Brunswick, Canada. Frame is a citizen of Canada.

3.      Plaintiff does not know the true names of the DOE Defendants and therefore sues them by fictitious names. Plaintiff is informed and believes and thereby alleges that each of these Defendants were in some manner responsible for the events and happenings alleged in this Complaint and for Plaintiff's injuries and damages.

## JURISDICTION AND VENUE

4.      As stated above, Plaintiff is a citizen of Delaware. No defendant is a citizen of Delaware. Frame is a citizen of Canada.

5.      This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. § 1332 because Plaintiff is a resident of a different country than Defendant and the amount in controversy exceeds $75,000. As set forth below, Plaintiff claims at least hundreds of thousands of dollars in damages.

6.      This Court is authorized to provide declaratory relief, as requested herein, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

7.      Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and (c)(2) because a substantial part of the events giving rise to this claim occurred in this judicial district and because Defendants have extensive contacts with, and conduct business within this judicial district and have caused injuries to Plaintiff, as described herein, in this judicial district.

# GENERAL ALLEGATIONS

## House Of Moves

8.      House of Moves, Inc. ("HOM"), is a Los Angeles based motion-capture, animation studio. HOM was founded in 1996 and over the last twenty years has become an industry leader. HOM is sought out by its clients because of its extensive experience with the creation of animated content across industries.

9.      HOM uses its innovative, proprietary, state-of-the-art "Helibug" technology to streamline the digital animation process and offer fully integrated high-quality production solutions for film, television and gaming clientele at competitive costs.

10.      HOM is also one of the busier motion capture facilities in the world, with full-performance motion capture services including one large motion capture stage and one modern full-performance capture sound stage with state-of-the-art cameras and processing equipment.

11.      HOM was incorporated as a California C-Corporation when it was purchased by Vicon Motion Systems, Inc. ("Vicon"), a United Kingdom Private Limited Company, in 2004. As part of the transaction HOM issued 1,000 shares to Vicon and HOM became wholly owned by Vicon.

12.      In 2008, Brian Rausch ("Rausch") was hired to be the Chief Executive Officer of HOM. Prior to joining HOM Rausch spent seven years at Sony Computer Entertainment directing Cinematics, Animation/Motion Capture, Scanning and Video Services. Under Rausch's direction HOM broadened its services, opening its now flourishing soundstage and digital animation services.

13.      HOM has several passionate and loyal employees who have been with the business for years. Dennis Hauck is the Technical Head of Production at HOM. He joined HOM in 2007. Eric Lashelle also joined HOM in 2008 as the Lead Animator, he is responsible for all animation projects that go out of HOM. Peter Krygowski joined HOM in 2009 and is the Creative Director. Bonnie

Robinson ("Robinson") is the Production Accountant; she handles all of taxes, insurance, bank transfer and business related needs. These are all key persons at the company

### Vicon Sells House Of Moves

14.    In or around September 2013, Vicon sought to sell HOM. Vicon determined that because HOM had developed into a full service production company, as opposed to the service provider it initially purchased, that HOM no longer fit within Vicon's business model.

15.    Vicon sought to sell HOM to a strategic industry partner with knowledge of HOM's industry who could further develop HOM's technology and content production capabilities.

16.    Vicon offered Rausch a first right of refusal to purchase HOM from Vicon given his vast expertise in the industry and great continued vision for HOM. As Rausch had spent five years pouring his heart and soul into HOM, he was highly interested in being an owner of this vibrant going concern. He had several options, including making the purchase himself through financing or finding investors who would take a mostly passive interest in the company.

17.    Beginning in or around January 2014, Rausch began his due diligence into HOM and began negotiating the terms of the sale with Vicon executives David Deacon ("Deacon") and Nick Bolton ("Bolton"). On or around January 23, 2014, Deacon sent Rausch the HOM financials and informed him that the working capital HOM would need after the deal was $600,000. This was critical because the structure of the deal insisted upon by Vicon was that it wanted to keep, after the closing, the revenue that was just coming in the door prior to the sale. Therefore, there would be a gap in revenue that would have to be covered in addition to the purchase price. This was always known to all involved in discussing the sale of HOM.

18.    On June 2, 2014, Rausch and Vicon executed a Letter of Intent which

formalized Rausch's intent to purchase HOM. The Letter of Intent clarified that an entity chosen by Rausch would purchase HOM for the total purchase price of $1.75 Million Dollars.

## Defendant Agrees To Invest In House Of Moves

19.    In or around July 2014, Rausch began discussions with Malcolm Blair ("Blair") and Nolan McDonald ("McDonald") about their becoming investors in a company that would purchase HOM. Blair and McDonald represented that they were acting on behalf of Defendant, and would act through and for that company.

20.    On information and belief Defendant Frame is wholly owned by Blair and McDonald.

21.    On information and belief Blair and McDonald, operate, supervise, manage, own, are the agents of and are alter egos of Defendant Frame.

22.     Pursuant to their discussions, Frame would provide the necessary capital for the deal and Rausch would provide his know-how and management skills as CEO of HOM, and most importantly, would open up to Frame, the right that a company of Rausch's choosing, Sketchy Studios, had to purchase HOM.

23.    From July to October 2014 Rausch sent both Blair and McDonald detailed due diligence documents including but not limited to HOM's financials for the previous four years, details on current and upcoming projects, business plans and expected cash flow and various HOM contracts. Rausch provided Blair and McDonald any and all documentation of HOM that they requested.

24.    In every correspondence from July to October, 2014 Blair and McDonald expressed their desire to make HOM an even more prominent and successful company in the industry. They never discussed their interest in HOM as a mere collection of assets and contracts to be reduced to liquidation value.

25.    In August 2014, Rausch, Blair and McDonald began to develop their proposal to Vicon for purchasing HOM. The parties exchanged several e-mails

discussing the best way to structure the deal, the purchase price they wanted to pay for HOM, and they developed their future business plan and goals for HOM.

26.    On August 26, 2014, Rausch sent both Blair and McDonald HOM costs that would need to be covered by Defendant Frame immediately after the deal closed.

27.    On September 1, 2014, Rausch sent the agreed upon proposal to Deacon. In the proposal, Rausch, Blair and McDonald explained that their plan was to build HOM through "slow and steady gains" and building customers and developing a "steady, growing cash flow." The proposal specifies that over the next three years Rausch, Blair and McDonald "plan on investing approximately $20,000,000 to launch an IP division of HOM." The proposal also echoes the previous understanding that the purchase price was lowered so that those funds could instead be invested directly into HOM as gap working capital.

28.    On September 2, 2014, Rausch sent Blair and McDonald another draft communication to Deacon confirming that Rausch, Blair and McDonald knew that HOM would require immediate capitalization after the sale and that Rausch and his investors would take over providing the working capital of HOM after the deal. Blair and McDonald approved of Rausch sending this communication to Deacon.

29.    On September 18, 2014, Blair e-mailed McDonald that their plan was to build HOM as a company with Rausch and to increase the value of HOM. This e-mail also confirmed that HOM would need working capital infused immediately after the deal closed.

30.    On October 6, 2014, Rausch sent an e-mail to Blair and McDonald listing the contemplated deal terms for Blair and Rausch to use while drafting a formal Stock Purchase Agreement for the contemplated company. This e-mail confirmed once again that Defendant Frame would be providing the initial investment and the operating capital of HOM.

## Plaintiff Enters Into Stock Purchase Agreement With Vicon For House Of Moves

31.     Because Rausch was still working with Defendant Frame to secure its investment in HOM, Rausch requested that the initial closing date of July 31, 2014, created by the Letter of Intent between Rausch and Vicon, be extended.

32.     On July 31, 2014, Deacon confirmed, on behalf of Vicon, that the closing date of July 31, 2014 was extended and placed a "go/no go" date for the deal of August 14, 2014. Once it was determined that the deal was a go, Vicon and Rausch would work on a stock purchase agreement.

33.     Rausch then informed Deacon that he had found an investor in Defendant Frame and that the deal would move forward.

34.     After deal negotiations between Vicon, Rausch and Frame, the parties agreed on a purchase price of $1,300,000 with $100,000 to be paid prior to closing to keep the deal open, $400,000 to be paid upon closing, and $800,000 to be paid in the form of a promissory note to Vicon with $200,000 due yearly on the anniversary of the closing.

35.     The promissory note portion of the purchase price was secured by cameras owned by HOM. The cameras used to secure the promissory note were essential to the daily operations of HOM as a motion capture and animation studio. All of the parties understood this fact.

36.     On September 22, 2014, Vicon sent Rausch the first draft of the stock purchase agreement. Vicon gave Rausch a deadline of September 26, 2014 for signing the stock purchase agreement, which was drafted so as to be signed only by Plaintiff, Sketchy Studios, LLC. Throughout the negotiations of the stock purchase agreement Vicon threatened to shut down HOM if the stock purchase agreement was not finalized.

37.     On September 29, 2014, Rausch formed Plaintiff Sketchy Studios, LLC, the company which represented his interest in the stock purchase agreement

with Vicon.

38.     The stock purchase agreement, dated September 26, 2014, was executed on September 29, 2014. A true and correct copy of the executed stock purchase agreement ("SPA") attached hereto as Exhibit A. Under the SPA the deal was to close on October 15, 2014 when Vicon would transfer all of the shares of HOM to Plaintiff.

39.     Vicon confirmed that its 1,000 shares of HOM were the only existing issued shares of HOM.

40.     The SPA included a separate security agreement ("Security Agreement") for the $800,000 promissory note. *See* Exhibit A. The Security Agreement also required that HOM pay certain accounts receivable to Vicon.

### Plaintiff And Defendant Execute A Letter Of Intent

41.     On September 26, 2014, Blair sent Rausch a Letter of Intent ("LOI") memorializing the terms on which Frame and an entity of Rausch's choosing might share ownership in HOM. Shared ownership was contingent upon a number of conditions, many of which were stated within the LOI. Shared ownership was also contingent on an implied condition: valid transfer of shares and rights from Vicon.

42.     On September 29, 2014, Plaintiff and Defendant executed the LOI, a true and correct copy of which is attached hereto as Exhibit B. Under the LOI, $500,000 was to be provided by Defendant to be used in the closing by Sketchy Studios with Vicon, "with the balance of the purchase price to be financed by [Vicon]'s taking back an $800,000 note." The LOI states that Frame will receive a "recoupment of 100% of the investment of $500,000 plus a 10% per annum cumulative return thereon before any disbursement to the other shareholders." This provision and Frame's argument it has a secured interest (possibly not properly perfected and filed) in assets of HOM depicts Frame as a lender to HOM rather than an owner of a contemplated parent company to HOM.

43.     However, the LOI also suggested the initial ownership of a contemplated new company that would be owned 40% by Brian Rausch and/or a company of his choosing and 60% by Frame with an option for 10% from Rausch/ a company of his choosing's percentage to be issued to the employees of HOM.

44.     The LOI stated that Plaintiff and Defendant would enter into a formal agreement officially setting forth their agreement and the key and material terms necessary to share ownership in the new company. To that end, the LOI states that "[a]ll of the terms and conditions of the proposed transaction would be stated in a new Shareholders agreement, to be negotiated, agreed and executed by [the parties]." *See* Exhibit B. This was to be done before any closing took place. This condition was a foundational condition for the going forward by the parties.

45.     The LOI also required that upon execution of that formal shareholders agreement, that substantially all of the employees of HOM would be offered continued employment at HOM and that Rausch – and no one else – would manage the contemplated new company.

46.     After executing the LOI, the Plaintiff and Defendant began discussing the more formal shareholder agreement for a new company, which was to have some relationship to HOM, which was to be entered into and executed before the closing date of the Vicon transaction.

47.     On October 7, 2014, in preparation for a conference call that day, Rausch sent Blair and McDonald an e-mail laying out the options for the parties to purchase HOM. Rausch set forth the three options as: (1) Blair and McDonald join Sketchy Studios and Sketchy Studios retains all of the stock of HOM, (2) Frame purchases 60% of the stock and Sketchy Studios purchases 40% of the stock, or (3) Rausch, McDonald and Blair join together to purchase the HOM stock.

48.     After discussing these options, McDonald and Blair decided to create Dimano Corp. ("Dimano"), a Delaware C Corporation to own the shares of HOM. Dimano was incorporated by Blair and/or McDonald alone. Still to this day

Dimano has no properly appointed board members, the percentage of ownership of it is in dispute, and it technically owns no assets, and has no appointed officers. It is a Delaware corporation, with no offices known to Plaintiff, no working capital, no assets, no shareholder agreement, no form of agreed upon corporate governance, no duly elected board members, and no properly appointed officers. It is a paper company the ownership of which is in dispute.

49.    On October 14, 2014, the day before closing date of the SPA, Blair sent Rausch a draft shareholder agreement for Dimano. Blair also indicated that Frame now wanted a 70% ownership interest in Dimano instead of the 60% stated in the LOI. This was a material change in terms and concealed until right before the closing and never agreed upon in a signed writing. No comprehensive shareholder agreement involving Frame or Dimano, as called for in the LOI, was ever agreed upon or executed.

### The Vicon Closing

50.    On October 14, 2014, counsel for Vicon sent counsel for Sketchy Studios the necessary corporate documents needed for the sale of Vicon's stock in HOM to Sketchy Studios (only). A true and correct copy of these documents, along with the e-mail cover letter is attached hereto as Exhibit C. These documents included a Stock Assignment Separate from Certificate, signed by the Secretary of Vicon, which effectively transferred all of Vicon's shares of HOM stock to Sketchy Studios. *See* Exhibit C.

51.    On October 15, 2014, during a call between Blair, McDonald and Rausch, Blair insisted that in order for Frame to provide the $400,000 required at the closing pursuant to the SPA that Sketchy Studios would have to assign its interest in the SPA to Dimano. It was understood at that time, that this request was premised on Frame's promise, through Blair and McDonald, to fund $500,000 hard dollars toward the closing of the sale of HOM from Vicon to Sketchy Studios, and to fund the long-discussed and absolutely necessary, gap working

capital that would be needed by HOM upon closing, given the structure of the Vicon deal and the budgets and financials exchanged.

52.    On October 15, 2014, Rausch sent Blair an e-mail stating "[t]his is to confirm in writing our agreement as follows: 1. I hereby transfer to Dimano Corp., a Delaware corporation, all my right title and interest under the Stock Purchase Agreement with [Vicon]. 2. I will be issued 30 percent of the equity of Dimano Corp., a Delaware corporation, in exchange for my payment of $10.00, which I will wire today per your instructions. Please confirm by return e-mail." A true and correct copy of this e-mail is attached hereto as Exhibit D. Blair responded to this e-mail later in the day with "Brian: Confirmed." *See* Exhibit D. A formal written agreement regarding the purported assignment was never executed. Technically, Rausch himself did not hold any personal rights to the SPA, but rather Plaintiff Sketchy Studios held and holds these rights. Lawyers handling this closing openly questioned whether all involved were running the risk of an ineffective, legally inoperative transfer of rights, and a lawyer for Blair even cautioned that the contemplated e-mail consent to a transfer of rights in the SPA by Brian Rausch alone would not be operative. *See* Exhibit E. It was not, as a matter of law, although the parties appear to have not heeded the warning by counsel.

53.    On October 15, 2014, Deacon, on behalf of Vicon, consented via e-mail to the purported assignment "of the SPA by Sketchy Studios, LLC (the Buyer under the SPA) to Dimano Corp." A true and correct copy of the e-mail chain with Vicon's consent is attached hereto as Exhibit E. Vicon's counsel, in response, sent a Stock Assignment Separate from Certificate, signed by Deacon as CFO of Vicon, which purported to transfer Vicon's shares of HOM stock to Dimano. *See* Exhibit E. This was inoperative as a matter of law as Vicon had already transferred all of its shares of stock in HOM to Sketchy Studios the day before. Sketchy Studios never assigned, or otherwise transferred, to Dimano the 1,000 shares of HOM stock it received from Vicon.

## Defendant Fails To Make Capital Contributions

54.     Almost immediately after the Closing, Defendant failed to follow through on its obligation to provide working capital to HOM. In October 2014, Rausch and Robinson made Blair and McDonald aware of the working capital needed from Frame in order for HOM to operate.

55.     However, Frame consistently failed to provide working capital as needed, and as specifically and previously promised by Frame, through Blair and McDonald, despite Rausch's and Robinson's repeated requests for capital. On several occasions Robinson informed Frame that HOM needed immediate capital to meet its obligations, including payroll. Frame's owners simply refused to provide the working capital that was promised before the deal closed, and Frame reneged and breached its promises nearly immediately after the deal in fact closed.

56.     As a result, Rausch, on behalf of Sketchy Studios, was forced to infuse capital into HOM on an emergency basis under protest.

57.     On December 12, 2014, due to Frame's dilatory capital contributions, Rausch, on behalf of Sketchy Studios, was forced to loan $63,000 to HOM, again under protest.

58.     On December 31, 2014, again due to Frame's failure to provide the necessary capital contributions, Rausch, on behalf of Sketchy Studios, was forced to loan another $60,000 to HOM. This time Blair, acting on behalf of Frame, agreed in writing that if this $60,000 loan was not paid back by Frame by January 31, 2015, that Sketchy Studios would become the 60% owner of Dimano and Frame would become the 40% owner of Dimano.

59.     On January 16, 2015, due to Frame's failure to inject working capital into HOM, the employees of HOM agreed to defer their paychecks so that HOM could meet its outstanding obligations.

60.     On January 26, 2015, Rausch, on behalf of Sketchy Studios, was again forced to loan $25,000 to HOM in order for HOM to meet its obligations.

61.    The $60,000 loan to HOM made December 31, 2015, by Rausch on behalf of Sketchy Studios was not repaid by January 31, 2015.

## Defendant Causes House Of Moves To Lose Assets

62.    As part of Vicon's sale of HOM, HOM continued to owe certain accounts receivable and rent to Vicon. These necessary payments were part of the necessary working capital of HOM, of which Frame, through its agents Blair and McDonald, had been aware well before the Closing.

63.    On December 9, 2014, Robinson and Rausch again made Frame, through Blair and McDonald, aware of monies due to Vicon and the immediate need for the promised working capital. In order to secure more time to pay the monies due to Vicon, Vicon and Frame, through Blair, amended the Security Agreement in the SPA to add more cameras as collateral for the Vicon loan, and extend the time frame for HOM to pay certain accounts receivable Vicon to January 31, 2015. Blair entered into this agreement, purporting to act on behalf of HOM, without informing Rausch or anyone at HOM or Sketchy Studios of the agreement. In doing so Blair acted in an ultra vires capacity as he himself had no rights to the collateral he was pledging. Rausch and Sketchy Studios only learned that Blair had secured the extension with the pledge of more HOM cameras after the ultra vires agreement was made.

64.    Despite being aware that if HOM did not pay Vicon the accounts receivable due that HOM would lose many of its cameras, which were absolutely essential to HOM's business, Frame refused to provide the necessary capital needed to pay the monies owed to Vicon.

65.    Because of HOM's failure to pay the accounts receivable Vicon collected on the Security Agreement and in March 2015 took the cameras owned by HOM from the very stages on which they were being used, causing severe injury HOM's business, and great damage to HOM and Sketchy Studios' interest in HOM.

66.    Blair, acting for Defendant Frame, and acting illegally and without any authority as the purported owner of HOM, instructed all HOM employees to allow and assist Vicon in its recovery of the cameras. In reality, Blair was only acting as an agent of Frame and as such caused great damage to HOM and thereby Sketchy Studios' ownership interest in HOM.

**Defendant Interferes With House Of Moves Business**

67.    The LOI between Sketchy Studios and Frame made clear that as CEO of HOM, Rausch would run the operations of HOM and was authorized to conduct business on Dimano's behalf, including, among other things, incurring indebtedness on behalf of HOM and managing HOM's assets.

68.    However, immediately after the closing, Blair and McDonald, acting for Frame, instead of providing the necessary working capital, demanded that they have access to HOM's QuickBooks, and other day-to-day management information. Because of legal infirmities in the Dimano transaction, they had and have no such right and must return all financial information at once.

69.    From December 2014 to March 2015, Defendant Frame, acting through Blair and McDonald, continued their efforts to take control of HOM's day-to-day operations. Blair and McDonald demanded to receive weekly project updates and financial reports from Robinson of HOM. Blair and McDonald demanded that Frame control the management of HOM. Blair and McDonald frequently asked for detailed information about HOM's accounts receivable, accounts payable and cash flow from Robinson despite having access to HOM's QuickBooks. Indeed, on February 12, 2014, Blair declared that as the purported owner of HOM he has the right to "direct the course of business as [he] sees fit."

70.    This was all at odds with the representations and promises made by Blair and McDonald as agents of Frame – which promises were made to induce Sketchy Studios to potentially allow Frame to somehow enter the Vicon-Sketchy Studios deal, as either indirect owners of HOM through Frame's participation in

Dimano, or as creditors.

71.    Blair and McDonald, as agents of Frame, began to attempt to render HOM incapable of operating as a going concern, evidencing only at this time their previously concealed agenda to harvest HOM's assets, cutting edge technology and contractual relationships after attempting it inoperable through their failure to provide the promised working capital and through their illegal, bad faith interference in its daily operations.

72.    In February 2015, Blair attempted to exercise his purported dominion over HOM and attempted to fire both Robinson and Rausch. On March 6, 2015, counsel for Frame sent a letter to Rausch discussing his purported removal from his position as CEO of HOM. This was done even though Frame, at best, owned a disputed ownership interest in Dimano, a paper company with no assets, with no actual, proper legal ownership over HOM, with no duly and properly appointed board, and no properly hired officers, no known offices, no shareholder agreement and no corporate governance structure, and even though Frame had promised Sketchy Studios repeatedly that Rausch and other the key employees of HOM would all be kept in place after the closing to the extent Frame even would have a say over such issues, through presumed but not yet achieved board positions within HOM.  This illegal attempt to interfere with Sketchy Studios' interest in HOM and with the day to day operations of HOM revealed the false promises by Frame through Blair and McDonald, and the heretofore concealed true agenda of Frame, which was to harvest HOM for itself, after ousting all who could oppose its plan.

## FIRST CAUSE OF ACTION

### (Fraudulent Inducement)

73.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in the paragraphs above as though fully stated herein.

74.    Defendant fraudulently induced Plaintiff to execute the LOI by

making misrepresentations of fact and/or by making promises without any intention of performing them. Defendant's misrepresentations and false promises include, but are not limited to: Defendant's representation to Plaintiff that after the Closing they would provide the working capital HOM needed to operate, Defendant's representation that Rausch would be left in charge of the day-to-day operations of HOM, Defendant's representation that the HOM employees would remain employed at HOM, and that HOM would continue to be an uninterrupted going concern.

75. Each of these representations was knowingly false when made. Defendant never intended to work with Plaintiff to develop HOM, instead Defendant's intent, at the time of the LOI, was to harvest the assets of HOM and shut down HOM.

76. Each of Defendant's representations was made with the intent to deceive or induce reliance on the part of Plaintiff. Plaintiff would not have executed the LOI if it knew Defendant's representations were false.

77. Plaintiff was not fully aware of the falsity of Defendant's representations until months after the LOI was executed, in February and March 2015, when the totality of Defendant's actions revealed that Defendant never intended to perform under the LOI.

78. Plaintiff justifiably relied on these representations in executing the LOI, and on or about September 26, 2014, Plaintiff and Defendant executed the LOI for the purpose of sharing ownership in HOM through a parent company. Plaintiff therefore relied on Defendant's promises instead of simply providing financing himself or moving forward with others who wanted to be a part of the deal.

79. As a result of these fraudulent misrepresentations, Plaintiff was fraudulently induced into executing the LOI and Plaintiff has suffered significant damages. Plaintiff's damages include but are not limited to, hundreds of

thousands of dollars as Plaintiff was forced to loan monies to HOM as a result of Defendant's failure to provide working capital to HOM, as promised to induce the execution of the LOI and as Defendant's actions – through its agents Blair and McDonald – which have wreaked havoc on HOM, an asset owned in whole or in part by Sketchy Studios, and caused HOM to lose real assets and profits estimated to be in an amount that is not less than hundreds of thousands of dollars to date. Plaintiff is therefore entitled to seek damages in an amount to be proven at trial.

80.    Defendant's conduct was malicious, intentional, and outrageous and constituted willful and wanton disregard for the rights of Plaintiff in that Defendant schemed and planned a bait and switch scam as outlined herein that impacts and is impacting the jobs and lives of all the HOM employees and Plaintiff, which owns all or most of the HOM. Such conduct was specifically directed at Plaintiff and its holdings, and as such warrants an award of punitive damages.

81.    As a result of Defendant's fraudulent inducement, to the extent that the LOI amounts to a binding agreement, Plaintiff is entitled to rescission of the LOI. Plaintiff will suffer substantial harm and injury under the LOI if it is not rescinded. By way of this Complaint, Plaintiff offers to restore to Defendant the $500,000 it paid upon rescission, offset by any damages owed and awarded by the Court to Plaintiff.

82.    Plaintiff intends service of the summons and complaint in this action to serve as notice of rescission of the LOI, to the extent it is a valid agreement, and hereby offers to restore all consideration furnished by Defendant under the LOI on the condition that the LOI is rescinded, subject to an offset for damages awarded Plaintiff against Defendant.

////

////

## SECOND CAUSE OF ACTION

### (Fraudulent Concealment)

83.   Plaintiff realleges and incorporates by reference herein each and every allegation contained in the paragraphs above as though fully stated herein.

84.   Prior to executing the LOI, Defendant made several false representations to Plaintiff in order to conceal their true intention to shut down HOM and harvest its assets.

85.   Defendant's misrepresentations and false promises include, but are not limited to: Defendant's representation to Plaintiff that after the Closing they would provide the working capital HOM needed to operate, Defendant's representation that Rausch would be left in charge of the day-to-day operations of HOM, Defendant's representation that the HOM employees would remain employed at HOM, and that HOM would continue to be an uninterrupted going concern.

86.   Each of these representations was knowingly false when made. Defendant never intended work with Plaintiff to develop HOM, instead Defendant's intent, at the time of the LOI, was to harvest the assets of HOM and shut down HOM.

87.   Each of Defendant's representations was made with the intent to deceive or induce reliance on the part of Plaintiff. Plaintiff would not have executed the LOI if it knew Defendant's true concealed intent to harvest HOM's assets and shut the company down.

88.   Plaintiff was not fully aware of the falsity of Defendant's representations until months after the LOI was executed, in February and March 2015, when the totality of Defendant's actions revealed that Defendant never intended to perform under the LOI.

89.   Plaintiff justifiably relied on these representations by executing the LOI, and on or about September 26, 2014, Plaintiff and Defendant executed the

LOI for the purpose of sharing ownership in HOM through a parent company. Plaintiff therefore relied on Defendant's promises instead of simply providing financing himself or moving forward with others who wanted to be a part of the deal.

90.    As a result of these fraudulent misrepresentations, Plaintiff was fraudulently induced into executing the LOI and Plaintiff has suffered significant damages. Plaintiff's damages include but are not limited to, hundreds of thousands of dollars as Plaintiff was forced to loan monies to HOM as a result of Defendant's failure to provide working capital to HOM as promised to induce the execution of the LOI and as Defendant's actions – through its agents Blair and McDonald – which have wreaked havoc on HOM, an asset owned in whole or in part by Sketchy Studios, and caused HOM to lose real assets and profits estimated to be in an amount that is not less than hundreds of thousands of dollars to date. Plaintiff is therefore entitled to seek damages in an amount to be proven at trial.

91.    Defendant's conduct was malicious, intentional, and outrageous and constituted willful and wanton disregard for the rights of Plaintiff in that Defendant schemed and planned a bait and switch scam as outlined herein that impacts and is impacting the jobs and lives of all the HOM employees and Plaintiff, which owns all or most of the HOM. Such conduct was specifically directed at Plaintiff and its holdings, and as such warrants an award of punitive damages.

92.    As a result of Defendant's fraudulent concealment, to the extent that the LOI amounts to a binding agreement, Plaintiff is entitled to rescission of the LOI. Plaintiff will suffer substantial harm and injury under the LOI if it is not rescinded. By way of this Complaint, Plaintiff offers to restore to Defendant the $500,000 it paid upon rescission, offset by any damages owed and awarded by the Court to Plaintiff.

93.    Again, Plaintiff intends service of the summons and complaint in this

action to serve as notice of rescission of the LOI, to the extent that the LOI amounts to a binding agreement, and hereby offers to restore all consideration furnished by Defendant under the LOI on the condition that the LOI is rescinded, subject to an offset for damages awarded Plaintiff against Defendant.

## THIRD CAUSE OF ACTION

### (False Promise)

94.     Plaintiff realleges and incorporates by reference herein each and every allegation contained in the paragraphs above as though fully stated herein.

95.     Defendant made material promises to Plaintiff in order to induce Plaintiff to execute the LOI. Defendant's misrepresentations and false promises include, but are not limited to: Defendant's representation to Plaintiff that after the Closing they would provide the working capital HOM needed to operate, Defendant's representation that Rausch would be left in charge of the day-to-day operations of HOM, Defendant's representation that the HOM employees would remain employed at HOM, and that HOM would continue to be an uninterrupted going concern.

96.     Defendant made the above promises, and each of them, without any intention to performance thereupon and with the intent to defraud and induce Plaintiff to reply upon the promises.

97.     Plaintiff was not fully aware of the falsity of Defendant's representations until months after the LOI was executed, in February and March 2015, when the totality of Defendant's actions revealed that Defendant never intended to perform under the LOI.

98.     Plaintiff justifiably relied on Defendant's false promises by executing the LOI, and on or about September 26, 2014, Plaintiff and Defendant executed the LOI for the purpose of sharing ownership in HOM through a parent company. Plaintiff therefore relied on Defendant's promises instead of simply providing financing himself or moving forward with others who wanted to be a part of the

deal.

99.    As a result of these false promises, Plaintiff was fraudulently induced into executing the LOI and Plaintiff has suffered significant damages. Plaintiff's damages include but are not limited to, hundreds of thousands of dollars as Plaintiff was forced to loan monies to HOM as a result of Defendant's failure to provide working capital to HOM as promised to induce the execution of the LOI and as Defendant's actions – through its agents Blair and McDonald – which have wreaked havoc on HOM, an asset owned in whole or in part by Sketchy Studios, and caused HOM to lose real assets and profits estimated to be in an amount that is not less than hundreds of thousands of dollars to date. Plaintiff is therefore entitled to seek damages in an amount to be proven at trial.

100.    Defendant's conduct was malicious, intentional, and outrageous and constituted willful and wanton disregard for the rights of Plaintiff in that Defendant schemed and planned a bait and switch scam as outlined herein that impacts and is impacting the jobs and lives of all the HOM employees and Plaintiff, which owns all or most of the HOM. Such conduct was specifically directed at Plaintiff and its holdings, and as such warrants an award of punitive damages.

101.    As a result of Defendant's false promises, to the extent that the LOI amounts to a binding agreement, Plaintiff is entitled to rescission of the LOI. Plaintiff will suffer substantial harm and injury under the LOI if it is not rescinded. By way of this Complaint, Plaintiff offers to restore to Defendant the $500,000 it paid upon rescission, offset by any damages owed and awarded by the Court to Plaintiff.

102.    Again, Plaintiff intends service of the summons and complaint in this action to serve as notice of rescission of the LOI, to the extent that the LOI amounts to a binding agreement, and hereby offers to restore all consideration furnished by Defendant under the LOI on the condition that the LOI is rescinded,

subject to an offset for damages awarded Plaintiff against Defendant.

## FOURTH CAUSE OF ACTION

### (Declaratory Judgment - LOI)

103.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in the paragraphs above as though fully stated herein.

104.    The LOI lacks sufficient terms to be a valid and binding agreement. The LOI is missing the material terms of payment of the $800,000 note to Vicon.

105.    The LOI is a non-binding agreement to agree. The LOI on its face states that "[a]ll of the terms and conditions of the proposed transaction would be stated in a new Shareholders agreement, to be negotiated, agreed and executed by [the parties]." *See* Exhibit B. The LOI calls for this further shareholder agreement to be entered into by October 12, 2014. A shareholder agreement was never entered into between the parties.

106.    There exists between the parties a substantial controversy of sufficient immediacy and reality with respect to the validity and legal significance and enforceability of the LOI to warrant an issuance of a declaratory judgment regarding the validity of the LOI.

107.    A judicial declaration is necessary and appropriate so that Plaintiff may ascertain the enforceability of the LOI and how this impacts its rights with respect to HOM.

108.    Because the LOI is missing essential terms, states conditions to its operative effect that never took place, rests on an assumed transfer of rights that never took place, and is a non-binding agreement to agree, Plaintiff is entitled to a declaratory judgment that the LOI is void and unenforceable.

## FIFTH CAUSE OF ACTION

### (Declaratory Judgment – Ownership of House of Moves Stock)

109.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in the paragraphs above as though fully stated herein.

110.   On October 14, 2015, Vicon, through its counsel sent to Plaintiff a Stock Assignment Separate from Certificate, signed by the Secretary of Vicon, which effectively transferred all of Vicon's shares of HOM stock to Sketchy Studios.

111.   Because Vicon transferred all of its shares of HOM stock to Sketchy Studios on October 14, 2015, the later October 15, 2015 purported transfer of the same stock to Dimano is invalid.

112.   Sketchy Studios never transferred its stock in HOM to Dimano as the only purported transfer of stock is an e-mail from Rausch, not Sketchy Studios, to Blair and which further is not a signed writing, and which for these and other reasons does not constitute a valid transfer of stock.

113.   Because the e-mail was not a signed writing it failed to fulfill the statute of frauds requirement that all transfers of stock valued over $500 are made in writing. There exists between the parties a substantial controversy over who owns the stock to HOM of sufficient immediacy and reality to warrant an issuance of a declaratory judgment regarding the ownership of HOM stock.

114.   A judicial declaration is necessary and appropriate so that Plaintiff may ascertain its rights in the stock of HOM.

115.   Plaintiff is entitled to a declaratory judgment that it owns 100% of the outstanding stock in HOM.

## SIXTH CAUSE OF ACTION

### (Declaratory Judgment – Frame Has No Ownership In HOM)

116.   Plaintiff realleges and incorporates by reference herein each and every allegation contained in the paragraphs above as though fully stated herein.

117.   Frame never acquired an ownership interest in HOM. Sketchy Studios owns 100% of HOM stock, Dimano never acquired any HOM stock and Frame and Sketchy Studios never entered into a shareholder agreement in Dimano.

118.   At best the $500,000 which frame provided to HOM was a loan which failed to have any necessary terms. The $500,000 which Frame provided to HOM did not have a repayment date, or specify out of which precise funds it was to be recouped.

119.   There exists between the parties a substantial controversy over whether Frame has, directly or indirectly, any ownership interest in HOM of sufficient immediacy and reality to warrant an issuance of a declaratory judgment regarding the characterization of the money that Frame provided to HOM.

120.   A judicial declaration is necessary and appropriate so that Plaintiff may ascertain its ownership interest in HOM.

121.   Plaintiff is entitled to a declaratory judgment that Frame has no ownership interest in HOM and that the $500,000 it provided to HOM is a loan.

## SEVENTH CAUSE OF ACTION

### Pled In The Alternative

### (Declaratory Judgment – Assignment of IP Rights)

122.   Plaintiff realleges and incorporates by reference herein each and every allegation contained in Paragraphs 1-72 above as though fully stated herein.

123.   Assuming, in the alternative, that the LOI is a valid agreement (or an agreement to agree), a substantial and immediate controversy exists as to whether the LOI is a valid present assignment of the intellectual property rights mentioned therein.  The LOI states that "NewCo will acquire substantially all. . . (i) the Intellectual software, known as Helibug, and all other related software to motion capture."

124.   Accordingly, since the language contemplates future action on unspecified terms, Sketchy Studios desires a judicial determination that the LOI did not transfer any rights to the Helibug software, or any other related intellectual property, to Frame or to Dimano.

////

## EIGHTH CAUSE OF ACTION

### Pled In The Alternative

### (Declaratory Judgment – Sketchy Studios as 60% Owner of Dimano)

125.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in Paragraphs 1-72 above as though fully stated herein.

126.    In December 2014, Plaintiff and Defendant entered an agreement whereby Plaintiff would provide a $60,000 loan to HOM to help HOM meet its financial obligations since Defendant had failed to follow through with the working capital it promised, and that if Defendant did not repay Plaintiff's loan to HOM by January 31, 2015, Plaintiff would become a 60% owner of HOM, through Dimano.

127.    On February 1, 2015, Defendant had not repaid the Plaintiff's loan to HOM. According to promises in writing by one of the two principals of Defendant, Blair, Plaintiff was to own 60% of Dimano at that point. Defendant now disavows that promise and claims it is the 60% owner of Dimano. Plaintiff disputes this claim. The issue of who owns what percentage of Dimano is a real and actual controversy that needs to be resolved immediately.

128.    There exists, therefore, between the parties a substantial controversy of sufficient immediacy and reality to warrant an issuance of a declaratory judgment regarding Plaintiff's ownership interest in HOM.

129.    A judicial declaration is necessary and appropriate so that Plaintiff may ascertain its ownership interest in HOM.

130.    Because Plaintiff was not repaid by January 31, 2015, Plaintiff is entitled to a declaratory judgment that it is at least the 60% owner of HOM through Dimano.

////

////

////

## NINTH CAUSE OF ACTION

### Pled In The Alternative

### (Breach of Fiduciary Duty)

131.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in Paragraphs 1-72 above as though fully stated herein.

132.    If Defendant is found to have been at all times the controlling shareholder in Dimano, Defendant owed various fiduciary duties to Plaintiff as the minority shareholder in Dimano.

133.    Defendant owed Plaintiff a duty of care and loyalty to make decisions in the best interest of Dimano and Plaintiff. Defendant breached its duty of care and loyalty by its actions, including, but not limited to, failing to provide working capital to Dimano's sole asset HOM, failing to resolve the debts HOM owed to Vicon and as a result failing to prevent HOM's cameras from being removed by Vicon, failing to allow Rausch, as the CEO of HOM, to run HOM and manage its day-to-day operations, intentionally interfering with Rausch's ability to manage HOM and otherwise causing complete chaos within HOM, and causing it to lose business and profits.

134.    Defendant owed Plaintiff a duty of good faith to not act intentionally with a purpose other than the bests interests of the corporation. Defendant breached this duty by its actions, including, but not limited to, failing to provide working capital to Dimano's sole asset HOM, failing to resolve the debts HOM owed to Vicon and as a result failing to prevent HOM's cameras from being removed by Vicon, failing to allow Rausch, as the CEO of HOM to run HOM and manage its day-to-day operations, and intentionally interfering with Rausch's ability to manage HOM and otherwise causing complete chaos within HOM, and causing it to lose business and profits.

135.    On or about February 25, 2015, Plaintiff, as a shareholder of Dimano, attempted to secure action by Dimano's board of directors to take appropriate

action to rectify Defendant's breach, but the directors have not even been properly and duly appointed and Frame has taken no action to rectify these issues, but only acted in its own interest treating HOM as its very own asset.

136.    As a result of Defendant's breach, Plaintiff suffered significant damages, including but not limited to, the decreased value of Plaintiff's interest in Dimano by decreasing the value of its sole asset HOM, hundreds of thousands of dollars more as Plaintiff was forced to loan to HOM as a result of Defendant's failure to provide working capital to HOM as promised to induce the execution of the LOI, further compensatory damages for and on account of the fact that and Defendant's actions through its agents Blair and McDonald which have wreaked havoc on HOM, an asset owned in whole or in part by Sketchy Studios, and further compensatory damages caused to Plaintiff on account of Defendant causing HOM to lose real assets and profits estimated to be in an amount that is not less than half a million dollars to date.

137.    Defendant's conduct was malicious, intentional, and outrageous and constituted willful and wanton disregard for the rights of Plaintiff. Such conduct was specifically direct at Plaintiff and as such warrants an award of punitive damages.

## TENTH CAUSE OF ACTION

### Pled In The Alternative

### (Breach of Written Contract)

138.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in Paragraphs 1-72 and 131-137 above as though fully stated herein.

139.    If Court finds that the LOI constitutes a valid and enforceable contract existed between Plaintiff and Defendant, in which Defendant agreed to jointly own HOM with Plaintiff, and/or that Defendant agreed to make capital contributions for the business operations of HOM in exchange for Rausch acting

as Chief Executive Office of HOM, then the following allegations are advanced.

140. Plaintiff performed all conditions, covenants, and promises under the LOI, except that performance with was excused by Defendant's breaches, or otherwise excused by Defendant.

141. Defendant, by its conduct as alleged herein, have breached its obligations under the LOI by its actions, including, but not limited to, failing to negotiate a more comprehensive shareholder agreement, failing to provide working capital to HOM, failing to resolve the debts HOM owed to Vicon and as a result failing to prevent HOM's cameras from being removed by Vicon, failing to allow Rausch to manage Dimano as required under the LOI, failing to allow Rausch, as the CEO of HOM to run HOM and manage its day-to-day operations, intentionally interfering with Rausch's ability to manage HOM and not offering employment contracts to HOM employees and attempting to fire HOM employees.

142. As a direct and proximate result of Defendant's breach of contract, Plaintiff suffered and will continue to suffer general and special damages in the form of, among other things, lost benefits under the LOI, hundreds of thousands of dollars as Plaintiff was forced to loan to HOM as a result of Defendant's failure to provide working capital to HOM as promised to induce the execution of the LOI and as a result of Defendant's actions, through its agents Blair and McDonald, which have wreaked havoc on HOM, an asset owned in whole or in part by Sketchy Studios, and caused HOM to lose real assets and profits estimated to be in an amount that is not less than half a million dollars to date. Plaintiff is therefore entitled to seek damages in an amount proven at trial.

////

////

////

////

## ELEVENTH CAUSE OF ACTION

### Pled In The Alternative

### (Breach of Implied Contract)

143.  Plaintiff realleges and incorporates by reference herein each and every allegation contained in Paragraphs 1-72 and 131-142 above as though fully stated herein.

144.  The several writings between the parties and the conduct of Plaintiff and Defendant implied a contract, which if valid, provides that whereby Defendant agreed to jointly own HOM with Plaintiff, and Defendant agreed to make capital contributions for the business operations of HOM in exchange for Rausch acting as Chief Executive Office of HOM.

145.  Plaintiff performed all conditions, covenants, and promises under the contract, except that performance with was excused by Defendant's breaches, or otherwise excused by Defendant.

146.  Defendant, by their conduct as alleged herein, have breached their obligations under the contract by its actions, including, but not limited to, failing to provide working capital to HOM, failing to resolve the debts HOM owed to Vicon and as a result failing to prevent HOM's cameras from being removed by Vicon, failing to allow Rausch, as the CEO of HOM to run HOM and manage its day-to-day operations, intentionally interfering with Rausch's ability to manage HOM and not offering employment contracts to HOM employees and attempting to fire HOM employees.

147.  As a direct and proximate result of Defendant's breach of contract, Plaintiff suffered and will continue to suffer general and special damages in the form of, among other things, lost benefits under the contract, hundreds of thousands of dollars as Plaintiff was forced to loan to HOM as a result of Defendant's failure to provide working capital to HOM as promised to induce the execution of the LOI and Defendant's actions through its agents Blair and

McDonald which have wreaked havoc on HOM, an asset owned in whole or in part by Sketchy Studios, and caused HOM to lose real assets and profits estimated to be in an amount that is not less than half a million dollars to date. Plaintiff is therefore entitled to seek damages in an amount proven at trial.

## TWELFTH CAUSE OF ACTION

### Pled In The Alternative

### (Breach of Covenant of Good Faith and Fair Dealing)

148.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in Paragraphs 1-72 and 131-147 above as though fully stated herein.

149.    Should the Court find that the LOI constitutes a valid and enforceable contract between Plaintiff and Defendant, in which Defendant agreed to jointly own HOM with Plaintiff, and/or Defendant agreed to make capital contributions for the business operations of HOM in exchange for Rausch acting as Chief Executive Office of HOM, then the following allegations are made in the alternative only.

150.    There is an implied covenant of good faith and fair dealing in every contract, including oral contracts.  This covenant provides that neither party to the contract will do anything deliberately to deprive the other of the benefits of the contract, and includes a duty that Defendant, as the parties to the contract with Plaintiff to jointly own HOM, would not act recklessly and jeopardize their ability to comply with their obligations under the contract.

151.    As a result of the above-described conduct, Defendant has failed and refused, and continue to fail and refuse, to perform its obligations under their agreement with Plaintiff.  Among other things, Defendant knowingly caused HOM to suffer lost vital equipment and entire chaos within its offices by refusing to infuse capital into the company for operations despite the fact Defendant agreed to do so as part of the agreement to jointly own HOM with Plaintiff, and by

attempting sua sponte to fire most the upper executives with no notice or authority just as they were negotiating major deals with large companies.

152.    As a direct and proximate result of Defendant's breach of contract, Plaintiff suffered and will continue to suffer general and special damages in the form of, among other things, lost benefits under the contract, hundreds of thousands of dollars as Plaintiff was forced to loan to HOM as a result of Defendant's failure to provide working capital to HOM as promised to induce the execution of the LOI and on account of Defendant's actions through its agents Blair and McDonald which have wreaked havoc on HOM, an asset owned in whole or in part by Sketchy Studios, and caused HOM to lose real assets and profits estimated to be in an amount that is not less than half a million dollars to date. Plaintiff is therefore entitled to seek damages in an amount proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Sketchy Studios, LLC prays for relief as follows:

1.    That the Court enter judgment for Sketchy Studios on each of the above claims for relief.

On its First Claim:

2.    For a declaration by the Court that the LOI is void as fraudulently induced.

3.    For compensatory and consequential damages in an amount according to proof at trial.

4.    For punitive damages.

5.    For a declaration by the Court that the LOI, to the extent that the LOI amounts to a binding agreement, has been rescinded.

6.    For restitution.

7.    For injunctive and preliminary relief as the Court deems appropriate.

On its Second Claim:

8.    For a declaration by the Court that the LOI is void due to fraudulent

concealment.

9.    For compensatory and consequential damages in an amount according to proof at trial.

10.    For punitive damages.

11.    For a declaration by the Court that the LOI, to the extent that the LOI amounts to a binding agreement, has been rescinded.

12.    For restitution.

13.    For injunctive and preliminary relief as the Court deems appropriate.

On its Third Claim:

14.    For a declaration by the LOI is void due to Defendant's false promises.

15.    For compensatory and consequential damages in an amount according to proof at trial.

16.    For punitive damages.

17.    For a declaration by the Court that the LOI, to the extent that the LOI amounts to a binding agreement, has been rescinded.

18.    For restitution.

19.    For injunctive and preliminary relief as the Court deems appropriate.

On its Fourth Claim:

20.    For a declaration by the Court that the LOI is a non-binding and non-enforceable agreement.

On its Fifth Claim:

21.    For a declaration by the Court that Sketchy Studios is the 100% owner of the stock in HOM.

On its Sixth Claim:

22.    For a declaration by the Court that Defendant has no ownership interest in HOM and that the funds it provided to HOM were a loan.

On its Seventh Claim

COMPLAINT

23.    In the alternative, for a declaration by the Court that the LOI did not transfer any rights to the Helibug software, or any other related intellectual property, to Frame Rates Inc.

On its Eighth Claim:

24.    In the alternative, for a declaration by the Court that Plaintiff is a 60% owner of HOM through Dimano.

On its Ninth Claim:

25.    In the alternative, for compensatory damages in an amount according to proof at trial.

26.    For punitive damages.

On its Tenth Claim:

27.    In the alternative, for compensatory damages in an amount according to proof at trial.

On its Eleventh Claim:

28.    In the alternative, for compensatory damages in an amount according to proof at trial.

On its Twelfth Claim:

29.    In the alternative, for compensatory damages in an amount according to proof at trial.

On all of its Claims:

30.    For such other and further relief as the Court deems just and proper.

March 18, 2015                LAW OFFICES OF GERARD FOX, INC.


By:  _____
        Gerard P. Fox
        Morgan E. Pietz
        Belinda M. Vega
        Lauren M. Greene
        Attorneys for Plaintiff
        SKETCHY STUDIOS, LLC

## **DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury in this action.

March 18, 2015                                LAW OFFICES OF GERARD FOX, INC.


By: _____
                                              Gerard P. Fox
                                              Morgan E. Pietz
                                              Belinda M. Vega
                                              Lauren M. Greene
                                              Attorneys for Plaintiff
                                              SKETCHY STUDIOS, LLC